# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND, Derivatively on behalf of EXCO RESOURCES, INC., | § § § § § | |
| Plaintiffs, | § § | |
| vs. | § § | |
| | § | **Case No.** |
| DOUGLAS H. MILLER, STEPHEN SMITH, JEFFREY BENJAMIN, VINCENT CEBULA, EARLE ELLIS, JAMES FORD, MARK F. MULHERN, T. BOONE PICKENS, JEFFREY S. SEROTA, ROBERT L. STILLWELL, ARES MANAGEMENT LLC and OAKTREE CAPITAL MANAGEMENT, LP, | § § § § § § § § § § | JURY TRIAL DEMANDED. |
| Defendants, | § § § | |
| - and - | § § | |
| EXCO RESOURCES, a Texas Corporation, | § § § § | |
| Nominal Defendant. | § § § | |

## SHAREHOLDER DERIVATIVE COMPLAINT
## FOR BREACH OF FIDUCIARY DUTY

Plaintiff International Painters and Allied Trades Industry Pension Fund, for its Derivative Complaint for Breach of Fiduciary Duty, alleges upon personal knowledge as to itself and its acts, and upon information and belief, derived from, inter alia, a review of documents filed with the Securities Exchange Commission ("SEC") and publically available news sources, such as newspaper articles, as to all other matters, as follows:

1.      This is a shareholder derivative action brought by plaintiff on behalf of Exco Resources, Inc. ("Exco" or the "Company"), against its Board of Directors, Defendants Douglas H. Miller ("Miller"), Stephen F. Smith ("Smith"), Jeffrey Benjamin ("Benjamin"), Vincent J. Cebula ("Cebula"), Earl E. Ellis ("Ellis"), B. James Ford ("Ford"), Mark F. Mulhern ("Mulhern"), T. Boone Pickens ("Pickens"), Jeffrey S. Serota ("Serota"), Robert L. Stillwell ("Stillwell"), Ares Management LLC ("Ares") and Oaktree Capital Management, LP ("Oaktree") (collectively the "Defendants"), arising out of Defendants' attempts to consummate the sale of all outstanding shares of Exco to Defendant Miller and other insiders for an inadequate consideration of $20.50 (the "Takeover Bid").

2.      Significantly, five of Exco's ten directors – Defendants Miller, Pickens, Ford, Serota, and Stillwell (the "Conflicted Board Members") – have decided they would rather not represent the other shareholders. Instead, the Conflicted Board Members are trying to buy the whole business for themselves or their private equity companies. Defendants Miller, Pickens, and their two investment companies, Ares and Oaktree, collectively control over 30% of Exco's shares.

3.      Breaches of the Defendants' fiduciary duties have occurred, and are continuing to occur, in connection with an unlawful scheme and plan to enable the Defendants to acquire 100% ownership of Exco for grossly inadequate consideration.  More specifically, the Defendant Miller, in connection with the Defendants Pickens, Ford, Serota, Stillwell, Ares and Oaktree, are attempting to purchase all of the outstanding shares of Exco for $20.50 per share. Miller claims that the Proposed Transaction is a "very compelling" offer and "is in the best interests of the company and its public stockholders."  However, this offer stands in stark contrast to Miller's recent valuation of the Company, when Miller claimed that Exco's net

asset value per share should be as high as $36.94 per share. Additionally, this almost $37.00 per share value that Miller places on the Company's does not take into account the latest news from the Company in  January 2011 that Exco's proved reserves increased over 55%, creating even greater long-term growth prospects for the Company.

4.      The directors are highly conflicted and have the burden of establishing the entire fairness of the transaction.   Recognizing these systemic conflicts of interest, the Defendants appointed a "Special Committee" of purportedly "independent" directors to consider the Takeover Bid.  The Special Committee is comprised of the defendants Mulhern and Cebula.  At least one of these two directors lacks independence.  Namely, Cebula has been a director since March 2007. He served as a Managing Director of Oaktree and its predecessors (one of the proposed buyers) through November 2007, where he was a founding member and employed beginning in 1994.  Cebula also served on the Company's Board during the period that EXCO went private, from July 2003 through October 2005.  Further, Cebula has earned hundreds of thousands of dollars as a Exco director, as set forth below.

5.      Pursuant to Texas law, an independent, disinterested party should be appointed to consider whether the process for considering the Takeover Bid is fair to Exco.  Furthermore, appointing only two directors to such a committee charged with the responsibility of determining fairness of the proposed acquisition of the Company is rare, given the risk of a stalemate.   Where one of the two members of such a committee *prima facie* lacks independence, it is apparent that protection of shareholder rights and maximization of shareholder value has taken a back seat to the interests of the Conflicted Board Members.

6.      The failure to appoint an independent Special Committee deters any potential competing bidders from even coming forward, because competing bidders recognize that

consideration and approval of a competing offer must pass muster with the Special Committee, whose loyalties lie with defendant Miller and the other defendant insiders seeking to take the Company private and capture all the intrinsic value of Exco for themselves, rather than the maximize value for the Company's shareholders, as is their duty.  The Special Committee has already demonstrated its lack of independence by adopting a Shareholder Rights Agreement that punishes any shareholder who reaches a 10% ownership threshold. Defendant Miller and the other insiders already collectively own over 30% and their existing shares are not subject to the penalty provisions of the Special Rights Agreement, rendering the status quo sought by the adoption of the Shareholder Rights Agreement to their benefit only. With a two-thirds majority vote required for approval of any merger under Texas law, the Special Committee in concert with Miller and the other insiders seeking to take the Company private have stacked the deck against another competing bidder from even coming forward, let alone mounting a successful competing bid.

7.     Each of the Conflicted Board Members has, and, if consummated, all Defendants will have, directly violated and/or aided and abetted the other Defendants' willful, reckless and wanton violations of the fiduciary duties owed to Exco. Absent judicial intervention, the Takeover Bid will be consummated, which will result in irreparable injury to Plaintiff and the Company. This action seeks to enjoin Defendants' unlawful conduct and to force the Board to take the necessary steps to: (i) create an unbiased mechanism to appoint and the appointment of an independent committee of at least three members to review the Takeover Bid and other strategic alternatives available to the Company; (ii) disclose all material information to the Exco shareholders necessary for them to make an informed voting decision on the Takeover Bid; (iii) maximize shareholder value, and (iv) avail themselves of all material

information necessary to make an informed judgment about the sale of the Company, which they have unlawfully failed to do thus far.

8.      Plaintiff has made a demand upon the Board of Directors of Exco to reconstitute the process by which the Board of Directors is assessing the Proposed Buyout because of the interestedness of the members of the Special Committee.  The Board of Directors has failed to respond to that demand.  The Board's failure to take action on Plaintiff's demand has again demonstrated that there are no safeguards in place to ensure the Takeover Bid is fair to the public shareholders of Exco.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a), (c), and (d) as Plaintiff and the Defendants are citizens of and domiciled in different states and the amount in controversy exceeds $75,000 exclusive of interest and costs. This action is not a collusive one to confer jurisdiction on this Court.

10.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more of the Defendants, including Exco, either resides in or maintains executive offices in this District, and a substantial portion of the transactions and wrongs that are the subject of this complaint, occurred in substantial part in this District. Finally, the Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

11.      Plaintiff International Painters and Allied Trades Industry Pension Fund ("IUPAT" or the "Fund") has been the owner of Exco common stock since May 2, 2007 and held without interruption to the present date.  Plaintiff is a citizen of the State of Maryland.

12.     Nominal Defendant Exco is a Texas Corporation engaged in the exploration, exploitation, development and production of onshore U.S. oil and natural gas properties. Exco's common stock is traded on the New York Stock Exchange under the symbol "XCO." Exco is a citizen of Dallas, Texas.

13.     Defendant Miller is the Chairman of the Board of Directors and Chief Executive Officer of the Company since December 1997. Miller was Chairman and Chief Executive Officer of Coda Energy, Inc., from 1989 until 1997.   In 2003, Miller took Exco private with the assistance of Exco's management, including Exco's President T.W. Eubanks, and with the approval of a Special Committee which was composed of the Defendant-director Smith and former director J. Michael Muckleroy.   In 2006, Exco's stock was again offered on the New York Stock Exchange.   As of October 29, 2010, Miller beneficially owned 6,572,308 shares of Exco common stock, including options to acquire 2,005,000 shares, totaling 3.1% of Exco's outstanding stock.   Miller is a citizen of Dallas, Texas.

14.     Defendant Pickens is a director of Exco. Defendant Pickens has also served as Chairman and Chief Executive Officer of BP Capital LP since 1996.   As of October 29, 2010, Pickens owned 10,649,100 shares of Exco common stock, or 5.0%, of Exco's outstanding shares. Pickens has been a Director of Exco since October 2005, and was previously a director of the Company from March 1998 through July 2003.   Pickens is a citizen of Pampa, Texas.

15.     Defendant Ford has been a director of Exco since December 1, 2007. Defendant Ford is also Managing Director of Oaktree.   Ford is a co-portfolio manager of Oaktree's Principal Opportunities Funds, which invest in controlling and minority positions in private and public companies.   Ford jointed Oaktree in 1996 following his graduation from the Standard Graduate School of Business.   Ford is a citizen of Pacific Palisades, California.

16.     Defendant Serota is a director of Exco.  Serota previously served as a director of Exco Resources and Exco Holdings from July 2003 through October 2005.  Defendant Serota has been a Senior Partner of Ares since September 1997. Serota has been a Director of Exco since March 30, 2007.  Serota is a citizen of Manhattan Beach, California.

17.     Defendant Stillwell is a director of Exco.  Stillwell has served as a director since October 2005. Defendant Stillwell has served as General Counsel of BP Capital LP, and Vice President and Treasurer for the T. Boone Pickens Foundation.  Stillwell is a citizen of Dallas, Texas.

18.     Defendant Smith is Vice Chairman of the Board, President, and Chief Financial Officer of Exco.  Smith has served as a director and Vice Chairman of the Board since June 2004.  Smith was appointed President and Secretary in October 2005.  He served as Secretary until April 2006 and began serving as Chief Financial Officer in June 2009.  Smith was previously a director from March 1998 to July 2003.  Smith also served as a member of the Special Committee when Exco went private in 2003.  As of July 22, 2010, Smith beneficially owned 430,220 shares of Exco common stock.  Smith is a citizen of Dallas, Texas.

19.     Defendant Benjamin has been a director of Exco since October 2005.  Benjamin was previously a director of the Company from August 1998 through July 2003, and a director of Exco's parent holding company from July 2003 through its merger into Exco.  Benjamin is a citizen of New York, New York.

20.     Defendant Cebula has been a director of Exco since March 2007.   He was previously a member of the Company's board of directors from July 2003 through October 2005. Prior to November 2007, Cebula was a Managing Director of Oaktree.  Cebula was a

founding member of Oaktree's Principal Opportunities Funds in 1994.  Since fiscal year 2007, Exco paid the Defendant Cebula the following compensation as a director:

|      | Fees Paid in Cash | Option Awards | Total |
|------|-------------------|---------------|-------|
| 2009 | $40,000 | $148,145 | $188,145 |
| 2008 | $40,000 | $72,333 | $112,333 |
| 2007 | $29,400 | $126,600 | $156,000 |
|      |         |          | **$456,478** |

 Cebula is a citizen of New York, New York.

21.     Defendant Ellis has been a director of Exco since October 2005. He was previously a member of the Company's Board of Directors from March 1998 through July 2003.  Ellis served as a director of Coda from 1992 through 1996, during which time frame the Defendant Miller was a Chairman of the Coda Board.  As of October 1, 2010, Ellis beneficially owned 571,306 shares of Exco common stock.  Ellis is a citizen of Pinehurst, North Carolina.

22.     Defendant Mulhern has been a director of Exco since February 2010. As of October 1, 2010, Mulhern owned 472,330 shares of Exco common stock.  Mulhern is a citizen of Apex, North Carolina.

23.     Defendant Oaktree is a Delaware limited partnership and is a global alternative and non-traditional investment manager with $75 million in assets under management as of June 30, 2010.  As of October 29, 2010, Oaktree and its affiliated entities owned 34,778,946 shares of Exco common stock, or 16.4% of Exco's outstanding stock.  Oaktree is a citizen of Los Angeles, California.

24.     Defendant Ares is a Delaware limited partnership and specializes in managing assets in private equity markets.  As of October 29, 2010, Ares, through its affiliate entities,

owned 12,946,537 shares of Exco common stock, or 6.1%, of the Company's outstanding shares. Ares is a citizen of Los Angeles, California.

25.     The Individual Defendants (named herein in ¶¶ 13-22), as officers and/or directors of the Company, stand in a fiduciary relationship to Plaintiff and the Company's other public stockholders and owe them the highest fiduciary obligations of good faith, fair dealing, due care, loyalty, and full and candid disclosure.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

26.     Exco is oil and natural gas company engaged in the exploration, exploitation, development and production of onshore North American oil and natural gas properties. Exco's principal operations are conducted in key U.S. oil and natural gas areas including East Texas, North Louisiana, Appalachia, and the Permian Basin in West Texas. In addition to Exco's oil and natural gas producing operations, Exco owns 50% interests in two midstream joint ventures located in East Texas, North Louisiana and Appalachia.

27.     As of December 21, 2009, Exco's "Proved Reserves were approximately 1.0 Tcfe, of which 96.5% were natural gas and 67.1% were Proved Developed Reserves.  For the year ended December 31, 2009, [Exco] produced 128.2 Bcfe of oil and natural gas. Based on December 2009 average daily production of 224.0 Mmcfe per day, this translates to a reserve life of approximately 11.7 years."  February 24, 2010 Form 10-K for the 2009 fiscal year.

28.     Exco experienced a "transformational" year in 2009, and was well poised for upward growth.  This growth has been driven in large part by Exco's Haynesville/Bossier and Marcellus shale resource plays. As stated by Exco in its January 25, 2011 Form 10-K/A:

Historically, we used acquisitions and vertical drilling as our vehicle for growth. As a result of our acquisitions, we accumulated an inventory of drilling locations and acreage holdings with significant potential in the Haynesville/Bossier and Marcellus shale resource plays. This shale potential has allowed us to shift our focus to exploit these shales, primarily through horizontal drilling. Future acquisitions are likely to be focused on supplementing our shale resource holdings in the East Texas/North Louisiana and Appalachian areas. We will continue to develop certain vertical drilling opportunities in our East Texas/North Louisiana, Appalachia and Permian areas as industry economic conditions permit.

…

In 2009, we drilled 103 wells and completed 101 gross (53.0 net) wells with 98.1% drilling success rate. Our 2009 development, exploitation and other oil and natural gas property capital expenditures totaled $299.8 million. In addition, we leased $106.0 million of undeveloped acreage primarily in the Haynesville/Bossier shale resource play in East Texas/North Louisiana. Midstream capital expenditures, prior to the formation of TGGT, were $53.1 million and corporate capital expenditures totaled an additional $52.5 million.

29.     In the February 23, 2010 press release accompanying Exco's 2009 fiscal year

financial results, Defendant Miller stated:

We achieved everything we set out to do, starting with our successful drilling program and results in the Haynesville area, execution of our divestiture program, including our strategic partnership with BG Group, and the deleveraging of our balance sheet. In Appalachia, we continued evaluating our Marcellus shale assets and spud our first full length horizontal well. All of this was accomplished in spite of a very difficult commodity price environment. Our derivative program provided us with the ability to execute our plans over a long-term horizon. We have completed our divestiture program enabling us to focus on our shale assets. We began 2010 with production of approximately 234 Mmcfe per day. This production level represents a new baseline which we will use to evaluate our future results. Already in 2010, our net production has increased to a current level in excess of 265 Mmcfe per day. We have increased our operated horizontal rig count to 13 in the Haynesville and plan to increase that rig count to at least 14 for the rest of the year. We also plan to run at least one operated horizontal rig in Appalachia throughout 2010 while we continue our testing and evaluations in that area. We continue to make significant investments in our people and technology to maximize the value of our shale assets.

30.     Finally, Defendant Miller acknowledged that, "[w]ith our concentrated portfolio of Haynesville and Marcellus shales, we are well positioned for *significant reserve additions and organic production growth*." *Id* (emphasis added).

31.     The Company further stated that, as it "continue[s] to increase our level of drilling in the Haynesville play, we expect our production to grow substantially." *Id*.

32.     Exco's share price was slow to respond to this positive outlook.  On February 23, 2010, Exco's stock closed at $18.59 per share.  Yahoo! Finance Historical Daily Stock Prices and Volume for Exco Resources, available at http://finance.yahoo.com/q/hp?s=XCO+Historical+Prices.  ("Yahoo! Finance Historical Stock Prices").  On February 24, 2010, following the announcement of fiscal 2009's financial results, Exco's stock closed at $19.28, a modest 3.6% increase from the previous day; Exco's per share price would not climb above its $20.57 price on April 9, 2010.  Yahoo! Finance Historical Stock Prices.

33.     Exco's directors were determined to demonstrate to analysts and stockholders just how undervalued Exco's stock was.  On June 8, 2010, Defendant Miller and/or other Exco directors, under the direction of the Defendant Miller, presented a net asset value ("NAV") summary to analysts and investors, which pegged a "low" NAV at $25.30 per share, and a "high" NAV at $36.20 per share – with an average value of $30.75 per share.  June 8, 2010 Form 8-K.  This median $30.75 value represented a significant difference from the $17.39 per share closing price on of Exco common stock on June 8, 2010.  Yahoo! Finance Historical Stock Prices.

34.     In or around July 12, 2010, the Defendant Miller and/or other Exco directors, under the direction of the Defendant Miller, presented a slightly increased NAV at meetings for

analysts and investors, with a "low" NAV at $25.43 and a "high" NAV at $36.94, with an average value of $31.19. July 12, 2010 Form 8-K. This mid-range NAV was still significantly higher then Exco's $14.40 per share closing price on July 12, 2010. Yahoo! Finance Historical Stock Prices.

35.     Analysts agreed with Defendant Miller's suggestion that Exco's stock was undervalued, and placed a high value of $29.00 per share on the stock. Yahoo! Finance Analyst Opinion for Exco Resources, Inc., available at: http://finance.yahoo.com/q/ao?s=XCO+Analyst+Opinion.

36.     In its August 3, 2010 press release announcing the results of the quarter ending June 30, 2010, Exco reiterated its focus on expansion, stating that its "growth target is to average a 30% annual increase in production for the next five years." Defendant Miller further stated that "[d]uring the second quarter we continued to accomplish our growth objectives at EXCO. We began with a pro forma production rate of 214 Mmcfe per day and exited the second quarter at over 300Mmcfe per day."

37.     As Exco had suggested in February 2010, the Company was indeed on the verge of a significant increase in its proved reserves. On January 13, 2011, Exco issued a press release announcing "a significant increase in its estimated proved reserves from prior year levels primarily attributable to continued drilling success in Haynesville shale play." Exco estimated its "total net resource potential to be approximately 11.3 Tcfe as of December 31, 2010" – over a 1000% increase compared to Exco's proved reserves of 1.0 Tcfe as of December 31, 2009. Exco further stated:

> Our proved reserves at December 31, 2010 are estimated at 1.5 trillion
> cubic feet equivalent (Tcfe) with a pre-tax PV10, a non-GAAP measure,

of $1.4 billion, calculated pursuant to SEC pricing rules, which are based on the simple average of the first of the month reference natural gas and oil prices for the prior twelve month period, adjusted for energy content, quality and basis differentials. For 2010, the reference price was $4.38 per Mmbtu for natural gas and $79.43 per Bbl for oil which resulted in an adjusted price of $4.37 per Mmbtu for natural gas and $75.83 per Bbl for oil. At year end 2010 our proved reserves were 55% proved developed and 97% natural gas. Based on our estimated full year 2010 production of 112 Bcfe, our reserve life equates to 13.4 years. Using the five year futures strip price at December 31, 2010 averaging $5.23 per Mmbtu for natural gas and $93.09 per Bbl for oil, as adjusted for energy content, quality and basis differentials our estimated proved reserves, would have been 1.6 Tcfe with a pre-tax PV10 of $2.1 billion.

| | **Proved Reserves (Bcfe)** | | |
|---|---|---|---|
| | **2010** | **2009** | **Increase** |
| Proved developed | 822 | 643 | 28 % |
| Proved undeveloped | 677 | 316 | 114 % |
| Total | 1,499 | 959 | 56 % |

38.     The Defendants have thus long been aware both of the undervalued nature of Exco stock and of Exco's potential for future growth.  The Takeover Bid represents the Defendants' attempt to deprive Exco's public shareholders of reaping the benefit of Exco's growth and prospects.

**The Proposed Transaction**

39.     On November 1, 2010, Exco issued a press release announcing that Defendant Miller had submitted to the Board of Directors a letter proposal (the "Letter") to purchase all of the outstanding shares of stock of the Company not already owned by Defendant Miller for a cash purchase price of $20.50 per share. The value of this offer is approximately $4.36 billion.

40.     The Letter stated, as follows:

I am pleased to express my interest in acquiring all of the outstanding shares of common stock of EXCO Resources, Inc. (the "Company") at a cash purchase price of $20.50 per share. I have preliminarily discussed this proposal with Oaktree Capital Management, L.P., on behalf of its funds and accounts under management, Ares Management LLC, on behalf of one or more of its funds under management, and Boone Pickens, and each has expressed an interest in pursuing the acquisition with me.

*I believe that $20.50 per share is very compelling and in the best interest of the Company and its public shareholders and that the shareholders will find this proposal attractive. This valuation represents a premium of 38% over today's closing price of the Company's common shares. The acquisition would be in the form of a merger of the Company with a newly-formed acquisition vehicle.*

*I would continue as Chairman and Chief Executive Officer following the transaction and expect that the Company's senior management team would remain in place.* I anticipate continuing to run the business in accordance with our current practice and maintaining the Company's valuable employee base, which we view as one of its most important assets.

I would expect to reinvest a significant portion of my equity ownership as part of this transaction. The remaining funds necessary to consummate the transaction would come from senior management, outside investment partners and, as needed, third party debt financing.

*My familiarity with the Company means that I will be in a position to proceed very quickly with this transaction.* I expect that you will establish a special committee of independent directors to consider this proposal on behalf of the Company's public shareholders with guidance from its own legal and financial advisors. I welcome the opportunity to present this proposal to the special committee as soon as possible.

Of course, no binding obligation on the part of the Company, myself or any of my potential investment partners shall arise with respect to this proposal or any transaction unless and until such time as definitive documentation that is satisfactory to us, recommended by the special committee and approved by the Board of Directors is executed and delivered.

I look forward to working with the special committee and its legal and financial advisors to complete a transaction that is attractive to the Company's public shareholders.

41.     As indicated above, Defendant Oaktree owns over 16% of Exco's shares,

Defendant Ares approximately 6% of Exco's shares, Defendant Pickens 5% of Exco's shares,

and Defendant Miller over 3% of Exco's shares, totaling over 30% of the Company's outstanding shares, as indicated in the Schedule 13-Ds filed between November 2 and November 3 by Ares, Oaktree, Miller and Pickens, each of which is dated October 29, 2010.

42.     The serious problems presented with this Takeover Bid were inherent from the beginning – namely, that the group of directors who collectively hold or control over 30% of Exco shares was jointly considering taking the Company private, and therefore, presenting an insurmountable barrier to any competing buyer, given the two-thirds majority shareholder vote required to successfully complete a merger under Texas law.

43.     On November 1, 2010, *The Wall Street Journal* published an in-depth article detailing these obvious problems and the inherent conflict.  The article, in its relevant parts, stated:

> Can Exco Shareholders Get a Fair Shake?
>
> Exco Resources announced Monday that its board chairman – who also happens to be its CEO — proposed to buy Exco for $20.50 per share, some $4.4 billion in all. It was quite a move from an individual who owns only 3% of Exco today.
>
> But, of course, the CEO is not working by himself. He has teamed up with others to make the bid: Oaktree Capital Management, Ares Management, T. Boone Pickens and his senior management.   And it is undoubtedly no coincidence that each of these is represented on the Exco board. ***In fact, five directors — or half of the Exco board representing over 30% of the outstanding Exco shares — have decided they would rather not represent the other shareholders.   Instead, they want to buy the whole business for themselves or their companies.***
>
> …
>
> No doubt that once the special committee is constituted it will immediately begin to struggle with these issues — particularly the issue of the effective blocking position of the management group.  ***No matter what the committee does, however, it will never be the same as having an auction where all potential purchasers are on equal footing.***

Moreover, it is not the disinterested directors who chose the time to conduct this process. … ***Nevertheless, it seems to me that if five directors on a board of ten want to see a company sold, they should not be putting a deal together in secret. Directors are supposed to be acting in their company's best interests.***

(Emphasis added).

44.     The 30% control in Exco stock held by the Conflicted Board Members only represents a piece of the puzzle, and does not address another pressing concern – the grossly inadequate consideration offered by the Proposed Buyout Defendants.

45.     On November 2, 2010, an article entitled "Is This Offer a Takeover or a Takeunder?" described how Defendant Miller had, in both June and July 2010, trumpeted Exco as undervalued – and further described how the presentation segment on the true NAV of the Company's shares was *pulled from the presentation in September 2010*:

> ***[A]s recently as July, Miller (or another senior member of the EXCO management team, with Miller's blessing) was out making a very different case for the company's undervaluation. A per-share value of $20.50 was certainly not in the ballpark of estimates provided to securities analysts, portfolio managers, and other potential investors.***
>
> …
>
> In the firm's low case scenario, net asset value per share is pegged at $25.43. ***In the high case scenario, which sees higher per-unit values assigned to reserves and a higher EBITDA multiple awarded to EXCO's 50%-owned Haynesville-area midstream business, NAV per share weighs in at $36.94.***
>
> The midpoint of those NAV estimates exceeds $31, which is more than 50% higher than the price tag that CEO Miller now deems "very compelling." So that's interesting.
>
> ***Management actually pulled this slide from a September presentation, when Monday's deal was most likely in the works. They also yanked the subsequent slide, which may make selling this deal to outside shareholders even tougher. In slide 8, titled "Unmatched NAV Growth," management lays out a road map to an NAV per share of $50 to $60 by 2014.*** This is based on $5 to $6 natural gas, which is roughly where Chesapeake (NYSE: CHK) sees prices

going over the next couple years, and management's plan of 30% to 40% annual growth for the next five years. (The latter has since been ratcheted back to 30% growth).

So is EXCO worth $20.50 per share, or far more? That depends on whether you listen to November Doug Miller or July Doug Miller. My best guess is that a higher offer would be needed to win over shareholders here. After all, they were just told their shares were worth at least $25, and should command twice that value in five years' time.

(Emphasis added).

46.     Although the Takeover Bid price of $20.50 per share represented a 38% premium to the $14.83 closing price of Exco's shares the day of the offer, Exco's shares have been trading at depressed levels in the months leading to the Takeover Bid. Between September 1, 2010 and October 29, 2010, EXCO traded between $13.53 (near its 52-week low of $13.25) and $15.82 per share.  Yahoo! Finance Historical Stock Prices.

47.     More significantly, Exco's shares were trading in the low twenties at the beginning of this year. The premium is, thus, misleading, because the shares are undervalued – as analysts have recognized, and as the Defendant Miller was himself stressing as recently as July 2010, when he pegged the median NAV of the Company's shares at $36.50.

48.     The safeguards for shareholders in the Takeover Bid are non-existent. The 30% control held by the Conflicted Board Members has the effect of making the Takeover Bid a *fait d'accompli*, and ensures that no competing offers will emerge for the Company.  The Conflicted Board Members will likely vote in favor of the Takeover Bid, regardless of whether the deal is beneficial to the public shareholders. In doing so, these Defendants stand to profit tremendously, and have every reason to vote its considerable shares for this low offer price for the Company.

**Appointment of the Special Committee**

49.     On November 4, 2010, Exco issued a press release announcing the Board had formed a Special Committee, consisting of the Defendants Cebula and Mulhern, to "evaluate and determine the Company's response to the proposal made on October 29, 2010" by Miller.

50.     The Defendant Cebula is not independent or disinterested.  In 1994, Cebula was a founding member of Oaktree's Principal Opportunities Fund.  Cebula also served for years as Oaktree's Managing Director.  Further, Exco has paid the Defendant Cebula $456,478 in director compensation from 2007 – 2009.

**Competing Bidders Begin to Emerge**

51.     On December 10, 2010, W.L. Ross & Co. LLC and its affiliated entities ("W.L. Ross"), filed a Schedule 13D, announcing holdings of 15,882,301 shares in Exco, totaling 7.5% of the Company's outstanding shares.  This 7.5% control is a significant change from W.L. Ross's holdings on October 1, 2010, which totaled only 0.88%.

52.     W.L. Ross & Co. is controlled by Wilbur Ross, who has been described as a "turnaround artist" by *The Wall Street Journal*, and as "perhaps the best-known financier in the United States, having been involved in the restructuring of $200 billion of defaulted companies' assets around the world" by Yale University.

53.     In its December 10, 2010 filing, W.L. Ross stated that the stock was acquired for "investment purposes," but that W.L. Ross "may take or propose to take, alone or in conjunction with others including [Exco], other actions intended to increase or decrease the [W.L. Ross's] investment in [Exco]…."  Critically, W.L. Ross stated it may

> engage in or encourage communications with, directly or through intermediaries, the Issuer, members of management and the Board of Directors of the Issuer, other existing or prospective security holders, industry analysts, existing or potential strategic partners or competitors, investment and financing professionals, sources of credit and other investors to ***consider exploring (A)***

*extraordinary corporate transactions, such as a merger (including transactions in which affiliates of Reporting Persons may be proposed as acquirers) or sales or acquisitions of assets or businesses,* (B) exchanging information with the Issuer pursuant to appropriate confidentiality or similar agreements, (C) changes to the Issuer's capitalization or dividend policy, (D) other changes to the Issuer's business or structure….

(Emphasis added).

## Exco and the Special Committee Entrench Themselves

54.     In reaction to the stock acquisition of W.L. Ross, and to further discourage bidders from making a competing bid for the Company, the Special Committee adopted a Shareholder Rights Agreement ("SRA") containing poison pill provisions.  The January 13, 2011 press release announcing the SRA stated, in its relevant part:

> The Special Committee of the Board of Directors of EXCO Resources, Inc. (NYSE: XCO) today announced it will explore strategic alternatives to maximize shareholder value, including a potential sale of the Company. *As part of a comprehensive process, the Special Committee will consider a previously announced unsolicited proposal received on October 29, 2010 from Douglas H. Miller, the Company's Chairman and Chief Executive Officer, to purchase all of EXCO's outstanding common shares for $20.50 per share in cash as well as acquisition proposals the Special Committee may receive from other interested parties and other strategic alternatives potentially available to the Company.*

> As previously announced, EXCO's Board of Directors has established a Special Committee of independent directors consisting of Vincent J. Cebula and Mark F. Mulhern to consider Mr. Miller's offer and related matters.

> At the direction of the Special Committee, the Company has adopted a shareholder rights plan with a one-year term. The shareholder rights plan is intended to enhance the ability of the Special Committee to conduct a thorough, deliberative process of exploring the Company's strategic alternatives.

> Under the terms of the shareholder rights plan, one right will attach to each share of the Company's common stock that is outstanding as of the close of business on January 24, 2011 and to each share issued thereafter prior to the expiration of the rights. The rights will become exercisable (subject to customary exceptions) only if a person or group acquires 10% or more of the Company's common stock (thereby becoming an "acquiring person") or commences a tender offer for 10% or more of the Company's common stock. If a person or group becomes an

acquiring person, upon payment to the Company of the exercise price of $75 per right, a holder (other than an acquiring person) will be entitled to purchase $75 worth of shares of the Company's common stock (or under certain circumstances, the common stock of an entity that completes a business combination with the Company) at a 50% discount. The plan exempts each holder of 10% or more of the Company's common stock on the date of the plan's adoption as long as they do not thereafter acquire an additional 1% or more shares of the Company's common stock, as well as parties that enter into qualifying standstill agreements with the Company. The Special Committee may, in its sole discretion, also exempt any transaction from triggering the plan. The rights expire on January 24, 2012 and the Company may amend the rights agreement or redeem the rights for nominal consideration at any time before the rights become exercisable.

(emphasis added).

55.     On January 13, 2011, Exco also announced the adoption of a standstill agreement between Defendant Miller, the Special Committee, and Exco (the "Miller Standstill Agreement"). The January 13, 2011 Form 8-K states, in its relevant part:

> The standstill provisions prohibit Mr. Miller from, among other things, acquiring additional shares of EXCO common stock, entering into agreements regarding or soliciting proxies in connection with an acquisition of EXCO and seeking to influence the management of EXCO in connection with such an acquisition. In addition, the Confidentiality Agreement prohibits Mr. Miller from entering into agreements preventing EXCO shareholders from voting in favor of or tendering their shares in other offers to acquire EXCO or preventing financing sources from providing financing to other parties in connection with an acquisition of EXCO.

56.     On January 25, 2011, Exco announced the adoption of a standstill agreement between Defendants Ares, the Special Committee, and Exco (the "Ares Standstill Agreement"). The January 25, 2011 Ares Schedule 13D states, in its relevant part:

> The standstill provisions prohibit Ares Management from, among other things, acquiring additional shares of EXCO common stock, entering into agreements regarding or soliciting proxies in connection with an acquisition of EXCO and seeking to influence the management of EXCO in connection with such an acquisition. In addition, the Confidentiality Agreement prohibits Ares Management from entering into agreements preventing EXCO shareholders from voting in favor of or tendering their shares in other offers to acquire EXCO or preventing debt or certain equity financing sources from providing financing to other parties in connection with an acquisition of EXCO. The Confidentiality

Agreement also limits the parties with whom Ares Management can enter into financing arrangements.

57.     It is transparent that the SRA was designed to defeat a takeover by another bidder or someone interested in pursuing a buyout via a tender offer.  The SRA effectively and clearly discourages alternative offers to purchase control of the Company.

58.     Further, the SRA was enacted to preserve the entrenched CEO and the rest of the Conflicted Board Members.  The only beneficiaries of the SRA are the Conflicted Board Members, who already possess greater then 30% of the Company's stock, thereby automatically preventing any competing bidder from ever obtaining the necessary 60% majority.  The SRA ensconces the CEO and the rest of the Conflicted Board Members by preserving their 30% control and further preventing any other alternative offers to purchase control of the Company – rendering it that much more unlikely that any competing bidder will be able to purchase control of Exco.

59.     On January 25, 2011, W.L. Ross announced it had acquired additional shares of Exco, totaling 18,012,301 shares of Exco, or 8.5% of the Company's outstanding shares.  It remains to be seen what action Mr. Ross, or any other competing bidder, will take next.

60.     However, the SRA, the Miller Standstill Agreement and the Ares Standstill Agreement, in combination with the lack of independence of the Special Committee, deter and defeat the ability of a competing bidder to purchase control of the Company.  The impediments will and are preventing any interested competing bidders from being able to defeat the greater then 30% control possessed by the entrenched CEO Miller and the rest of the Conflicted Board Members, and will and are preventing any interested competing bidders from otherwise making a competing offer.

**The Individual Defendants' Fiduciary Duties**

61.     By reason of the Individual Defendants' positions with the Company as directors and/or officers, the Individual Defendants are in a fiduciary relationship with Exco and with the Plaintiff and Exco's public shareholders.  The Individual Defendants' owe Exco and its shareholders the highest duty of good faith, fair dealing, loyalty, and full and candid disclosure.

62.     Further, in reviewing the Takeover Bid, the Exco Board has initiated a process to sell the Company which imposes heightened fiduciary responsibilities and requires enhanced scrutiny by the Court. If agreed to, the terms of the proposal would be arrived at without a full and thorough investigation by the Individual Defendants, and they are intrinsically unfair and inadequate from the standpoint of the Exco and its shareholders.

63.     By virtue of their positions as directors and/or officers of Exco, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Exco to engage in the practices complained of herein.

64.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Company and its shareholders and with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person.  In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to maximize the value shareholders will receive rather then use a change of control to benefit themselves, and to disclose all material information concerning the proposed change of control to enable the shareholders to make an informed voting decision.  To diligently comply with this duty, the directors of a corporation may not take any action that discourages or inhibits alternative offers

to purchase control of the corporation or its assets, or will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders.

65.      The Individual Defendants, separately and together, in connection with the Takeover Bid, violated duties owed to Exco and the Plaintiff and other public shareholders of Exco, including their duties of loyalty and good faith, insofar as they, interalia, engaged in self-dealing and obtaining for themselves personal financial benefits not shared equally by Plaintiff or the public shareholders of Exco; discouraged and inhibited alternative offers to purchase control of Exco; and failed and are failing to search for and secure the best value reasonably available for Exco and its public shareholders.

66.      The Individual Defendants' agreement to the terms of the proposal and its timing, demonstrate a clear lack of due care and of loyalty to Exco and its public shareholders. The timing of the proposed sale of Exco to Defendant Miller, and possibly a group consisting of other insiders, also appears opportunistically timed to take advantage of the current economic downturn.

67.      The Individual Defendants' fiduciary obligations under these circumstances require them to seek out the best value reasonably available to the Company and its shareholders.  This obligation requires the Individual Defendants to be appropriately informed, to undertake an evaluation of Exco's net worth as a merger/acquisition candidate, and to appoint an independent and impartial special committee to fairly and adequately consider the Takeover Bid and any alternative course of action or proposals available to Exco.  The Individual Defendants' have and are breaching these fiduciary duties by creating a two-member Special Committee, and by appointing a conflicted Board member, the Defendant

Cebula, to the Special Committee.   As such, the Special Committee cannot fairly and adequately consider the Takeover Bid or any alternative courses of action available to Exco. Furthermore, in the absence of an independent and impartial Special Committee, competing bidders are discouraged from investigating a potential transaction with the Company or otherwise submitting an offer to the Company.   Accordingly, the Individual Defendants and the Special Committee will be unable to fairly and thoroughly investigate alternative courses of action or proposals available to Exco.

68.     Plaintiff and the Company will be damaged in that they will not receive their fair proportion of the value of Exco's assets and business, and will be prevented from obtaining fair and adequate consideration for their shares of Exco common stock. The consideration to be paid to shareholders in the Proposal is unfair and inadequate for all the reasons discussed above, among other things:

a.     The intrinsic value of Exco common stock is materially in excess of the amount offered for those securities in the Proposal giving due consideration to Defendant Miller's statements in July of 2010;

b.     The Company's recent growth; and

c.     The depressed trading prices prior to the Proposal.

69.     Further, by entertaining the proposal of Defendant Miller, the Individual Defendants have allowed the price of Exco stock to be capped, thereby depriving Plaintiff and the Company of the opportunity to realize any increase in the value of Exco stock.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

70.     Plaintiff brings this action derivatively in the right and for the benefit of Exco to redress injuries suffered, and to be suffered, by Exco as a direct result of the breaches of

fiduciary duty, as well as the aiding and abetting thereof, by the Defendants.  This is a not a collusive action designed to confer jurisdiction on this Court which it would not otherwise have.

71.     Plaintiff will adequately and fairly represent the interests of Exco and its shareholders in enforcing and prosecuting its rights.

72.     Plaintiff is and was an owner of Exco during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

73.     On January 21, 2011, Plaintiff made a demand pursuant to Texas Bus. Orgs. Act § 21.553.  Defendants have failed to comply with that demand.

74.     Plaintiff's demanded "that the Board take the necessary steps to: (1) disclose all material information to the EXCO shareholders necessary for them to make an informed voting decision on the Takeover Bid; (2) maximize shareholder value; and, (3) avail themselves of all material information necessary to make an informed judgment about the sale of the Company, which they have unlawfully failed to do thus far. Included in this demand is: (i) the creation of an unbiased mechanism to appoint and the appointment of an independent committee of at least three members to review the Proposed Transaction and other strategic alternatives available to the Company; and (ii) the rescinding of the January 13, 2011 shareholder rights plan."   Due to the critical nature of the demand, Plaintiff requested a response by the close of business Wednesday, January 26th.   Attached as **Exhibit A** hereto is the January 21, 2011 demand of Plaintiff.

75.     It is known to Plaintiff that the Board has already received demands challenging the independence of the Special Committee, and requesting that the Board reconstitute the Special Committee.  The Board failed to take any action upon this demand.  These allegations

are contained in the November 22, 2010 Complaint filed the matter captioned *Guerra v. Miller*, 10-cv-2385.

76.     As of the date of filing of the instant Complaint, Plaintiff has received no response to its demand.  The Board's failure to respond to Plaintiff's demand constitutes a rejection of this demand.

77.     Moreover, as a result of the facts set forth throughout this Complaint, and additionally pursuant to Texas law, demand on the Exco Board to institute this action because the Company, its goodwill and debt rating are being and will be injured as a result of Defendants' actions.  Therefore, irreparable injury to the Company will result by waiting for the expiration of the 90 day period, and further, such a demand was futile and useless act, particularly for the following reasons:

a.     Each of the key officers and directors knew and or directly benefited from the wrongdoing complained of herein;

b.     in order to bring this suit, all of the directors of Exco would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, including with Defendant Miller and each other, which they will not do, thereby excusing demand;

c.     the acts complained of constitute violations of fiduciary duties owed by Exco's officers and directors and these acts are incapable of ratification;

d.     each member of the Exco Board is, directly or indirectly, the recipient of remuneration paid by the Company or the Conflicted Board Members, including benefits, stock options, and other emoluments by virtue of their Board membership and control over the Company, the continuation of which is dependent upon their

cooperation with the other members of the Board, and their participation and acquiescence in the wrongdoing set forth herein and are therefore incapable of exercising independent objective judgment in deciding whether to bring this action.

78.      Accordingly, Plaintiff is seeking emergency injunctive relief and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## FIRST CAUSE OF ACTION
### Claim for Breach of Fiduciary Duty Against the Individual Defendants

79.      Plaintiff incorporates by reference and realleges each and every allegation set forth herein.

80.      The Individual Defendants have violated their fiduciary duties of care, loyalty, candor, and good faith owed to Exco and its public shareholders and have exposed Exco to potentially irreparable injury in the form of, among other things, harm to the Company's reputation and credit rating.

81.      By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants, individually and acting as part of a common plan, are attempting to unfairly deprive the Company, the Plaintiff and other shareholders of the true value of their investment in Exco.

82.      As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, and due care owed to Exco and its shareholders, because, among other reasons, the Individual Defendants failed to take steps to maximize the value of Exco.  The Individual Defendants did this by, among other

things failing to adequately consider potential bidders, instead of favoring the Defendant Miller and the Conflicted Board Members.

83.     The Individual Defendants have the duty to obtain the highest possible value for Exco and its public shareholders.  The Individual Defendants failed breached their duty to obtain the highest possible value for Exco and have failed exercise the care required because the Individual Defendants have appointed the Defendant Cebula, a conflicted director with ties to Oaktree, to a two-member Special Committee.

84.     The Individual Defendants dominate and control the business and corporate affairs of Exco and are in possession of private corporation information concerning Exco's assets, business, and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between the Individual Defendants and the public shareholders of Exco, which makes it inherently unfair for the Individual Defendants to benefit their interests to the exclusion of maximizing shareholder value.

85.     As a direct result of the foregoing acts, practices, and course of conduct, the Individual Defendants have failed to utilize ordinary care and diligence in the exercise of their fiduciary obligations toward Exco, the Plaintiff and the other public shareholders.

86.     As a result of the actions of the Individual Defendants, Exco has suffered and will continue to suffer damage to its reputation and goodwill herein.

87.     As a result of the actions of the Individual Defendants, Plaintiff will suffer irreparable injury in that it will not receive its fair portion of the value of Exco's assets and businesses and therefore has been and will be prevented from obtaining a fair price for its common stock.

88.     Plaintiff, on behalf of the nominal defendant Exco, has no adequate remedy at law.   Only through exercise of this Court's equitable powers can Exco and its public shareholders be fully protected from the immediate and irreparable injury which the Individual Defendants' actions threaten to inflict.

## SECOND CAUSE OF ACTION
Claim for Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty
Against the Defendants Oaktree and Ares

89.     Plaintiff incorporates by reference and realleges each and every allegation set forth herein.

90.     The Defendants Oaktree and Areas have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to Exco and its public shareholders, and have participated in such breaches of fiduciary duties.

91.     The defendants Ares and Oaktree knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.   In so doing, Ares and Oaktree rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Takeover Bid in breach of their fiduciary duties.

92.     Plaintiff, on behalf of the nominal defendant Exco, has no adequate remedy at law.   Only through exercise of this Court's equitable powers can Exco and its public shareholders be fully protected from the immediate and irreparable injury which the Individual Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment against Defendants as follows:

A.     Declaring that this action is properly maintainable as a derivative action and certifying Plaintiff as the representative of Exco Resources, Inc.;

B.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the proposed transaction, unless and until the Company adopted and implements a procedure or process to obtain a merger agreement providing the best possible terms for shareholders;

C.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the proposed transaction, unless and until the Company adopts a method to appoint and appoints three or more independent and disinterested persons qualified to evaluate the Takeover Bid and any other potential proposed buyout;

D.     In the event that the proposed transaction is consummated, rescinding it and setting it aside, or granting Plaintiff rescissory damages;

E.     Awarding compensatory damages against Defendants, individually and severally, in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law, arising from the proposed transaction;

F.     Awarding Plaintiff the costs and disbursements of this action and a reasonable allowances for fees and expenses of Plaintiff's counsel and experts; and

G.     Granting Plaintiff such other and further relief as the Court may deem just and proper.

DATED: February 1, 2011.

Respectfully Submitted,

_____
JEFFREY GOLDFARB
State Bar No. 00793820
HAMILTON LINDLEY
State Bar No. 24044838
**GOLDFARB BRANHAM  LLP**
Saint Ann Court
2501 N. Harwood Street, Ste. 1801
Dallas, TX 75201
(214) 583-2233 Telephone
(214) 583-2234 Facsimile
jgoldfarb@goldfarbbranham.com
hlindley@goldfarbbranham.com

STEWART L. COHEN
STUART J. GUBER
JILLIAN A.S. ROMAN
**COHEN PLACITELLA & ROTH**
Two Commerce Square
2001 Market St., Suite 2900
Philadelphia, PA 19103
(215) 567-3500 Telephone
(215) 567-6019 Facsimile
scohen@cprlaw.com
sguber@cprlaw.com
jroman@cprlaw.com

**ATTORNEYS FOR PLAINTIFF**